**JOSEPH E. TOPPER v. ALCAZAR OPERATING COMPANY**

35 So. (2nd) 392
May 4, 1948
Rehearing denied May 31, 1948

January Term, 1948
Special Division A

422

*Thomas H. Anderson* and *Herbert L. Nadeau,* for appellant.

*Evans, Mershon, Sawyer, Johnston & Simmons, W. O. Mehrtens* and *M. L. Mershon,* for appellee.

CHAPMAN, J.:

On May 16, 1946, the Alcazar Operating Company leased to Topper and Drory the concessions to operate for a period of ten years (a) the coffee shop situated on the ground floor and (b) the dining room and bar situated on the thirteenth floor, with furniture and fixtures therein, of the Alcazar Hotel located on Biscayne Boulevard, Miami, Florida. The rentals for the first year were based on a percentage of the business transacted, with a minimum guarantee of $10,000 and $15,000 per annum for the subsequent years. The lessees were required to deposit with the Alcazar Operating Company as security for the performance of the lease the sum of $15,000 viz: the sum of $5,000 on the execution of the lease and an additional $5,000 on the commencement of the lease and $5,000 on the beginning of the second year of the lease. The electricity consumed was to be paid by the lessees.

The Alcazar Operating Company, on June 17, 1946, by separate instrument leased the cocktail bar situated on the ground floor of the hotel to Topper and Drory. The lease was for a period of one year and yielded rentals in the sum of $20,000, payable as follows: $7,500 on the execution and the further sum of $7,500 four months after the date the cocktail bar was ready for operation, and $5,000 eight months after the cocktail bar was ready for operation. A clause providing for a renewal of the lease for nine years was incorporated in the lease, and the annual rentals under the new lease were for the sum of $20,000, payable monthly, plus a percentage of the business transacted in excess of $75,000 in any one year.

The lessees stipulated to pay extra for electrical current consumed. Ernest M. Drory, in October, 1946, assigned his interest in both leases to Topper and the latter became the sole lessee and operator under the terms of both leases.

On June 6, 1947, the Alcazar Operating Company and Joseph E. Topper by mutual consent agreed to cancel the lease dated May 16, 1946, and each signed a written instrument by the terms of which each of the parties released and discharged the other from any claim, liability, suit or action because of said lease, thereby rendering the same void and without legal effect. Some of the witnesses testified that the Alcazar Operating Company forgave the lessee Topper the sum of $3,600 in defaulted rents under the terms of the canceled lease. The witnesses for lessee Topper dispute this testimony and contend that the consideration for the cancellation of the lease was an oral agreement by the Alcazar Operating Company to execute a lease to Joseph E. Topper on the cocktail lounge on the ground floor of the hotel.

Joseph E. Topper filed in the Circuit Court of Dade County, Florida, a suit for declaratory decree, accounting, specific performance and other relief against the Alcazar Operating Company. It was alleged that during the month of June, 1947, Topper proposed to the Alcazar Operating Company that he would cancel his lease on "the dining room and the bar on the top floor of the Alcazar Hotel and the hotel would cancel an alleged claim of $6,000 for rents and the hotel would grant Topper a new lease on the coffee shop on the ground floor and a new lease for the operation of the cocktail bar on the ground floor, and, in part performance of said agreement, Topper surrendered the dining room and bar on the top floor of the hotel, and that a new lease be given him on the coffee shop and the cocktail lounge on the ground floor." The Alcazar Operating Company refused to carry out its agreement and executed the leases according to its agreement. The plaintiff does not owe the defendant any sum of money as rents but the defendant has in its possession a sum of money of the plaintiff in an amount in excess of the total amount due by the defendant for all commissions covering all periods of time prior to filing suit.

Paragraph VI of the bill of complaint was amended and alleged therein that the lease which the defendant agreed to give the plaintiff and under which the plaintiff was to operate a cocktail lounge on the ground floor of the Alcazar Hotel was to be on the same terms and conditions as in the existing lease, except the amount thereof was to be determined by the plaintiff and the defendant after the determination by them as to what gross receipts of the business to be conducted by the plaintiff on the premises were and the rents to be paid to the defendant were to be a reasonable sum of money based upon the gross receipts which it was estimated that the plaintiff would derive from the operation of the cocktail bar.

It was alleged that the lessee Topper had an option to renew the lease as set out in his Exhibit No. 2, which recited that the "lessor does hereby give and grant to the lessees the option to renew this lease for the balance of the term of the lease dated the 2nd day of November, 1945, from Anna Brodsky and others to the Alcazar Operating Company . . . provided that if the lessees elected to renew this lease, then they shall do so at least 60 days prior to the expiration of the one year term hereof and in that event a new lease shall be drawn and executed by the lessor and lessees embodying the terms and conditions of this lease," etc. The plaintiff Topper alleged that he gave proper notice and requested a renewal of the lease within the 60 day period prior to September 12, 1947. The bill prayed for (a) a specific performance of the agreement of the parties for a renewal of the lease of the coffee shop and the cocktail bar situated on the ground floor; (b) an accounting; (c) if specific performance be denied of the agreement for a lease as described in paragraph VI of the bill, then the defendant be required to specifically perform the renewal option set out in plaintiff's Exhibit No. 2.

The Alcazar Operating Company in its answer denied the material allegations of the bill of complaint and alleged that the plaintiff lessee did not elect to renew the lease sixty days prior to September 10, 1946, neither has he deposited or offered to deposit the sum of $10,000, or any other sum, as security for the performance by the lessee of the terms and conditions imposed by the lease, and that the lessee has not of-

fered to perform the conditions and provisions of the renewal option set out in plaintiff's Exhibit No. 2. The answer denied specifically the allegations of the bill of complaint to the effect that a verbal agreement had been made for a new lease on the cocktail lounge on the ground floor of the Alcazar Hotel.

Testimony of the parties was heard by the Chancellor on the issues made by the pleadings and on final hearing the court held (1) that the equities of the cause were in favor of the defendant wherein the plaintiff sought specific performance of an alleged oral contract to make a new lease on the cocktail lounge on the ground floor of the Alcazar Hotel; (2) that the plaintiff was entitled to a renewal of the lease on the cocktail bar under the option to renew as set out in plaintiff's Exhibit No. 2, after compliance with the enumerated condition and provisions of the lease; (3) that the Alcazar Operating Company was indebted to the plaintiff lessee in the sum of $1,425.39. The plaintiff below appealed.

In the case of Daubmyre v. Hunter, 86 Fla. 326, 98 So. 69, we held that specific performance of a contract for the sale or lease of land is not a matter of right in either party, but a matter of sound discretion in the court, controlled by settled principles of law and equity applicable to the particular facts, and the discretion of the chancellor in refusing specific performance of a contract for the sale or lease of real estate will not be disturbed on appeal unless clearly erroneous. Richardson v. Varn, 80 Fla. 517, 86 So. 503, and similar cases. Likewise, it is fundamental that specific performance will not be enforced where the contract is not definite and certain as to essential terms and provisions and is incapable of being made so by the aid of legal presumption or evidence of established customs. Rhode v. Gallat, 70 Fla. 536, 70 So. 471; Maloy v. Boyett, 53 Fla. 956, 43 So. 243.

The case of Camichos v Diana Stores Corporation, 157 Fla. 349, 25 So. (2nd) 864, involved the following renewal provision of a lease viz: "12. It is agreed by and between the parties hereto that the lessee shall have the refusal of the property for an additional term at a rental and term to be agreed upon between the parties." We held that this provision of the renewal lease was too indefinite to be enforced

in an action for specific performance. See Gulf Theatres Inc. v. Guardian Life Ins. Co., 157 Fla. 428, 26 So. (2nd) 188.

It is established that specific performance will not be enforced where the contract is not definite and certain as to essential terms and provisions and is incapable of being made so by the aid of legal presumption or evidence of established customs. Rhode v. Gallat, supra. The basis for this ruling is that courts are not authorized to write contracts for litigants and supply material terms or provisions omitted by the parties. Section 725.01 F.S.A. (being the statute of frauds), requires certain instruments to be in writing. Plaintiff Topper testified that the extension of the lease on the cocktail bar on the ground floor was part of the consideration for the cancellation of the ten year lease on the top floor: I was to get a new lease on the bar that was to be based on the terms of the old lease with the exception of the rental and the rental was to be based on how much business the bar did." Mr. Morris said: "We will go over the books and see how much business you did for the year and we will come to an agreement on the rent; we will see how much you can pay." Plaintiff's witness Wexler testified on this point to the effect: "There wasn't any determined rent other than the fact that he (Morris) said wait until your lease is up and we will see what business you have done and then we're going to base the rentals on that."

The testimony of the plaintiff and witness Wexler is disputed and contradicted on the point in controversy by Mr. Morris, of the Alcazar Operating Company. He testified viz: "Q. What was the conversation about in your office at that conference? A. I told him that the Variety Club wanted to make a lease direct (with) the Alcazar Operating Company; and to do that I would have to get a release from him of the 13th floor; that I would be willing to take his release, even though there is a loss of rental of about $4,000. I told him that the Variety Club only offered $6,000 rent, while he was paying $10,000 and that in the subsequent years he had to pay fifteen. I said rather than have a bad tenant, I will take that $4,000 loss, and give them a lease direct, and give him a lease for the coffee shop, to take the place of the original lease; that I would also cancel whatever indebtedness there is between

us at the time. I computed that to be around $6,500 or $7,000. I wasn't sure of the amount, because I didn't have any figures before me. Mr. Topper then said, 'Well, what about the bar?' I said, 'I don't care to discuss the bar with you; the bar is a separate lease, and each lease stands on its own bottom.' He hung his head and said, 'I haven't got much choice in the matter.' I said, 'You haven't; you either take my proposition or forget about it.' . . . Q. I will get you to state whether or not you and Mr. Topper at that conference agreed on the cancellation of the dining room and coffee shop lease, and the writing of a new lease for $5,000 a year on the coffee shop? A. We did. Q. You stated that he had asked 'What about the bar room?' A. That's right. Q. And what did you state to him? A. I said, 'I do not care to discuss it with you; each lease stands on its own bottom.' There are two separate leases. Q. I will get you to state whether at that time you agreed to make him a new lease on the cocktail bar? A. I did not. . . . Q. I will get you to state whether or not you had a conversation with Mr. Topper in the cocktail bar. A. When? Q. In June of 1947—May, or June? A. I did not. Q. Did you at any time have a conversation with him in the bar, where you discussed the cocktail bar lease, or a renewal of it? A. I did not. Q. Were you ever in the bar talking to Mr. Topper when this Mr. Wexler was in the bar? A. I haven't been there; I never saw Mr. Wexler in the bar. Q. Did you at any time make any agreement, or offer to Mr. Topper to extend or renew the lease to the cocktail bar? A. I did not."

The Chancellor failed to recite reasons for the conclusions reached and expressed in the final decree, but, it is reasonable to assume that the record will support the inferences or deductions viz: (1) the testimony adduced by the plaintiff below to establish the amount of the monthly rentals for the new lease on the cocktail lounge was too vague, indefinite and uncertain to conform to our adjudications and requirements of the statute of frauds; (2) that the cancellation of the lease on the top floor of the hotel was not a consideration, in part, for a new lease on the cocktail lounge but the lease was cancelled by Morris so that a tenant able to pay the rents could be obtained; (3) that Mr. Topper had not been able to make a.

profit out of the top floor; (4) that Mr. Topper by education and training was a lawyer and not a successful concession operator; (5) the facts offered by the plaintiff to sustain a decree of specific performance were legally insuficient; (6) the Chancellor saw the witnesses on the stand and heard them testify and in the exercise of his discretion elected to believe the testimony of the witness Morris rather than Topper and Wexler; (7) there is substantial testimony in the record that the plaintiff Topper was behind on his rents on the top floor and the hotel forgave him around $3,600 when the lease was cancelled by the joint writing of the parties; (8) there is substantial evidence iin the record to the effect that the cancellation of the top floor lease was not the consideration for the new lease on the cocktail lounge on the ground floor; (9) other sound reasons may be offered in support of the final decree entered in the lower court.

Counsel for appellant contends that the testimony adduced will support a decree for the plaintiff in the sum of $12,280.05 rather than the sum of $1,425.39 and the decree of the Chancellor is contrary to the weight of the testimony. The plaintiff and defendant produced their respective bookkeepers and evidence of accounts between the parties rests on this testimony and records. The Chancellor made a finding on this point and set out the balance in the decree. It cannot be said, when all the testimony is carefully weighed and considered on the point in controversy that error has been made to appear.

Affirmed.

THOMAS, C. J., TERRELL, J., and WHITE, Associate Justice, concur.