ROBERTS, Justice.
This is a controversy between plaintiff-appellee, Parrish, and defendant-appellant, Shaw Brothers Oil Company, as to the right of Parrish, as operating lessee, to occupy until February 1958 a service station. The controversy arose out of the following undisputed facts:
Shaw Brothers Oil Company (“Shaw” hereafter) is a distributor of Pure Oil products and has as its district agent one Young. The service station premises are owned by one Pierce. In 1948 Pierce leased the property for a five-year term to one Miller who assigned the lease to Young in 1948 or 1949. On September 17, 1951, Young subleased the premises to Parrish, as operating lessee, for a term expiring February 1, 1953, with the following extension option:
“The sub-Lessor [Young] gives and grants to the sub-Lessee [Parrish] an option to extend this lease for five years beginning at the expiration of the original term hereof at a rental to be mutually agreed upon at a later time and specifically provided that the sub-Lessor exercises his option of renewing said original lease from Wm. Pierce to E. J. Miller dated February 7, 1948 and assigned March 30, 1948 by E. J. Miller to W. C. Young.”
By the terms of the Young-Parrish sublease, Parrish agreed to sell and use exclusively the petroleum products handled by Young and to pay a monthly rental for the premises of one cent per gallon of all gasoline sold during the month, with a minimum rental of $1,800 per year.
Parrish went into possession of the premises in September of 1951 and operated the service station in accordance with his agreement with Young. In the fall of 1952 Pierce entered upon an expansion program under which, among others, a new filling station building was to be constructed and the old building demolished. The new service station was to be constructed partially on lands covered by the Young-Parrish lease and on other property owned by Pierce adjacent thereto (referred to hereafter as the “enlarged premises”), on which other improvements were also to be made. Pierce’s construction program was financed by the Pure Oil Company; and under date of September 17, 1952, Pierce gave Pure Oil a mortgage on the enlarged premises, executed a 15-year ground lease of such premises to Pure Oil, and took back a sublease of such premises from Pure Oil. Thereafter, under date of December 1, 1952, Pierce leased the filling-station portion of the enlarged premises to Young for 15 years at a monthly rental of one cent per gallon “on all gasoline and motor fuel sold on the said premises.” The old Pierce-Miller-Young lease, dated February 7, 1948, was cancelled. Young assigned his new filling-station lease to Shaw on March 27, 1953, “as of December 1st, 1952”. Shaw also succeeded, by assignment, to the rights of Pure Oil under the ground lease and mortgage.
Parrish continued to operate the old filling station during the construction of the new one and, without interruption, began the operation of the new station when it was completed and the old station demolished. At one point he was supplying gas to his customers from both the old and the new pumps. The change-over to the new station was accomplished some time prior to April 1, 1953; and the record shows that, as of March 27, 1953, Parrish was charged and paid an increased rental on the new filling station representing one cent per gallon on all gasoline and other motor fuel sold on the premises, instead of the previous rental of one cent on gasoline alone. The checks in payment of the new rental were made by Parrish to Shaw. The operation of the new station by Parrish was in accordance with his operating lease with Young as to operating hours and, apparently, as to the exclusive sale of the petroleum products handled by Young (and, of course, by Shaw whose district agent Young was).
*612 Prior to the time he moved into the new station, Parrish spoke to Young about the extension of his lease and, after he moved, mentioned it to a representative of Shaw Brothers. But, except for a mimeographed form labelled “Report of Service Station Changes” signed by Young as district manager for Shaw, showing the date of the change-over by Parrish from the old to the new station as April 1, 1953, and the rate of rent on the new station as “$.01 on all motor fuels sold for highway purposes”, no formal recognition or statement of their relationship was made by the parties. After moving into the new station, Parrish made extensive additions to his filling station equipment, put fill in the driveway, and built a small extension on the side of the building and put a roof on it for the storage of tire repair equipment.
In December of 1955, after accepting payments of the increased rental from Parrish since February 1953 and apparently without objecting to his tenancy, Shaw served Parrish with a notice of eviction and then filed eviction proceedings against him in the County Court. The instant suit was filed by Parrish against Shaw to enjoin the prosecution of the eviction proceeding and to establish his right, in equity, to occupation of the premises until the expiration of the extended lease period, to wit, February 1, 1958.
Upon a consideration of the affidavits, depositions, and exhibits of the parties, the Chancellor entered a summary decree in favor of Parrish. This appeal by Shaw followed.
No contention is here made by Shaw that it is not bound by the activities of its district agent, Young, and understandably so. Cf. Ayala v. Murrell, Fla. 1957, 97 So.2d 13.'
It is first contended on behalf of Shaw that the extension option is not capable of specific performance because it leaves the rental to be “mutually agreed upon at a later time” and is thus too indefinite and uncertain to be enforceable in a court of equity. Relied upon in support of this contention are Camichos v. Diana Stores Corp., 157 Fla. 349, 25 So.2d 864; and Topper v. Alcazar Operating Co., 160 Fla. 421, 35 So.2d 392. Neither of these decisions is dispositive of the question o'f whether a lessor could validly refuse to comply with an agreement to extend a lease for a definite term where the amount of the rental for the extended term is to be fixed by future agreement of the parties. There is a conflict among the courts of other jurisdictions on this question. See 32 Am.Jur., Landlord and Tenant, § 965, p. 810; Hall v. Weatherford, 1927, 32 Ariz. 370, 259 P. 282, 56 A.L.R. 903; but cf. Citizens Building of West Palm Beach, Inc., v. Western Union Telegraph Co., 5 Cir., 120 F.2d 982.
This question need not be decided under the facts here present. After charging and accepting the increased rental from and performance by Parrish for almost three years of the five-year extension term —which rental, incidentally, was the same as that charged in the Pierce-Young lease dated December 1, 1952, under which Shaw Brothers is claiming as assignee — Shaw cannot now be heard to contend, in a court of equity, that the extension option is void and unenforceable because the provision for rental under the extended term is indefinite and uncertain. There is nothing in the record to indicate that the parties have ever had any dispute about rental. In these circumstances, this attack on the extension option was properly held by the Chancellor to be without merit. Cf. Hodkin v. Perry, Fla.1956, 88 So.2d 139.
Stating as its final point involved on the appeal the question “Did plaintiff Parrish in fact exercise the option to renew his sublease from Young?” the appellant Shaw has attacked, from various directions, the propriety of the Chancellor’s decree under the facts shown by the record. The answer to these contentions is contained in the one simple fact that the parties are in á court of equity, and their rights were adjudicated by the Chancellor under equitable prin *613 ciples. As well-stated in 32 Am.Jur., Landlord and Tenant, § 965, p. 811: “Where one of the parties has acted on faith of the renewal covenant and placed himself in such position that he cannot be adequately-compensated except by a renewal of the lease, a court of equity will secure to him his right and benefits under the renewal covenant, by some appropriate remedy, which, in most instances, is in effect very similar to a decree of specific performance.”
No error having been made to appear, the decree appealed from should be and it is hereby
Affirmed.
TERRELL, C. J., THOMAS and DREW, JJ., and HARRIS, Circuit Judge, concur.